**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **MONOLITHIC POWER SYSTEMS, INC.,** | § | |
| **a Delaware corporation; and** | § | |
| **CHENGDU MONOLITHIC POWER** | § | |
| **SYSTEMS CO., LTD., a Chinese Corporation,** | § | |
| | § | **CASE NO. 6:20-cv-00876** |
| | § | |
| **Plaintiffs,** | | |
| | | |
| **vs.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **MERAKI INTEGRATED CIRCUIT** | § | |
| **(SHENZHEN) TECHNOLOGY, LTD.,** | § | |
| **a Chinese corporation; and** | § | |
| **PROMATE ELECTRONIC CO., LTD.,** | § | |
| **a Taiwanese corporation,** | § | |
| | § | |
| **Defendants.** | | |

**COMPLAINT FOR PATENT INFRINGEMENT, TRADE SECRET**
**MISAPPROPRIATION, TORTIOUS INTERFERENCE, AND UNFAIR COMPETITION**

Plaintiffs Monolithic Power Systems, Inc. and Chengdu Monolithic Power Systems Co., Ltd. (collectively, "MPS" or "Plaintiffs") bring this suit against Defendants Meraki Integrated Circuit (Shenzhen) Technology, Ltd. ("Meraki") and Promate Electronic Co., Ltd. ("Promate") (collectively, "Defendants"), and allege as follows:

**NATURE OF THE ACTION**

1.      This is a civil action that includes claims for damages and injunctive relief under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, for the infringement of three patents: United States Patent Nos. 8,067,973 ("the '973 Patent"), 8,400,790 ("the '790 Patent"), and 10,432,104 ("the '104 Patent") (together, the "Asserted Patents"). True and correct copies of these patents are attached as Exhibits A–C.

2.      This action also includes claims for damages and injunctive relief for Defendants' trade secret misappropriation, tortious interference, and unfair competition.

## INTRODUCTION

3.      This action is premised on the facts below of clandestine corporate espionage more appropriate for the pages of a spy novel than business relations in the semiconductor industry.

4.      MPS is a world leader in the design, development, manufacture, and sale of semiconductor products, including synchronous rectifier products that help convert the alternating current ("AC") from electrical wall outlets to the direct current ("DC") that is needed to power many everyday devices like smart phones and laptop computers.  Founded in 1997, MPS has achieved significant growth year over year and great financial success due to its unmatched technical innovation and ability to offer high-performance products that are used in consumer electronics, automotive, communications, and storage products.  MPS's mission is to reduce total energy consumption in its customers' systems with practical, energy-efficient solutions.  To continue to innovate, MPS has invested significant resources to developing a large patent portfolio covering its semiconductor products, including its synchronous rectifier products.

5.      Defendant Meraki competes directly against MPS for customers of synchronous rectifier products, including products that are designed to be pin-for-pin compatible with MPS's products, and are brazenly advertised as such.

6.      On information and belief, Meraki was founded by two former employees of MPS, Mr. Wei (Wayne) Dong, and Ms. Lin (Elaine) Sheng, around April 2017—only weeks after they quit their jobs under mysterious circumstances.  Each of their brief tenures at MPS lasted approximately one year—apparently, the perfect amount of time to infiltrate MPS, steal its trade secrets, and get out fast.  On information and belief, Mr. Dong and Ms. Sheng never intended to work for MPS long-term. While Mr. Dong promised to move his family to MPS's California

location to entice MPS to hire him, and Ms. Sheng promised that she would move to California after a brief period of remote work, neither Mr. Dong nor Ms. Sheng followed through on these promises.

7.    Like all employees of MPS, Mr. Dong and Ms. Sheng were required to sign confidentiality agreements as conditions of their employment which prevent them from using or disclosing MPS's confidential information to unauthorized third parties.

8.    However, on information and belief, Mr. Dong and Ms. Sheng spent much of their short tenure at MPS plotting to steal highly confidential trade secrets related to the design and layout of MPS's synchronous rectifier products.

9.    A forensic analysis of the MPS laptop computers assigned to Mr. Dong and Ms. Sheng shows that—before they even joined MPS—Ms. Sheng had already prepared a cost-competitive analysis comparing MPS's products to other competitors, including their former employer Texas Instruments.  The preparation of such market analyses is not typically a job responsibility of an engineer like Ms. Sheng.  It turns out, however, that Mr. Dong and Ms. Sheng, were planning all along to form their own competing company using MPS's trade secrets.

10.   On information and belief, Mr. Dong and Ms. Sheng took steps to start their own company (Meraki) while still employed by MPS.  Ms. Sheng even lied to MPS when she resigned by stating she was going "to work on something complete [sic] different at a local IC start-up company" when Meraki was neither "compete[ly] different" than Ms. Sheng's MPS work, nor "local" to North Carolina where Ms. Sheng lived, as Mr. Dong and Ms. Sheng formed Meraki (in China) to compete against MPS for the exact same customers with the exact same products.

11.   As part of their work for MPS, Mr. Dong and Ms. Sheng had direct access to confidential trade secrets related to the design and layout of MPS's synchronous rectifier products.

Ms. Sheng even requested access to MPS's confidential information on multiple occasions, beyond what would typically be required in her position. A recent forensic analysis shows that both Mr. Dong and Ms. Sheng had connected personal external storage devices to their MPS laptops while employed with MPS and had copied confidential files to those devices, including confidential customer marketing lists, competitive analyses, and technical design files.

12.     In addition, Meraki was founded under the names of their mothers, in an apparent effort to cover their tracks and avoid associating their names directly with Meraki's business registration. Meraki's business registration also lists an angel investor, suggesting that, on information and belief, Mr. Dong and Ms. Sheng were negotiating with potential investors in Meraki while still employed at MPS.

13.     Recently, Meraki has started marketing and selling synchronous rectifier products, including, e.g., the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families ("Accused Products"), some of which are designed to be pin-for-pin compatible with MPS's products, like the MP6908, and are even advertised as such.

14.     Meraki's synchronous rectifier products incorporate trade secrets about the design and layout of MPS's synchronous rectifier products—trade secrets that Mr. Dong and Ms. Sheng could only have learned through their employment with MPS—in violation of the confidentiality agreements they signed with MPS as a condition of their employment.

15.     Meraki's synchronous rectifier products also infringe a number of MPS's patents that were developed to protect MPS's own innovation in the field of synchronous rectification. Meraki knew that the sales of its infringing products would infringe MPS's patents. Indeed, upon

information and belief, Mr. Dong and Ms. Sheng were well aware of MPS's patents as a result of their engineering roles at MPS.  In addition, by referring customers and potential customers in the United States to certain distributors, such as Defendant Promate, Meraki has induced and continues to induce third parties to offer for sale and import into the United States its infringing products. Meraki's intent is for its products to reach the United States through online marketplaces that sell to the United States, such as Taobao, which, on information and belief, receives Meraki products through Meraki's distributors like Qiansheng.

16.     Moreover, Meraki has contributorily infringed the Asserted Patents because the Accused Products have no substantial non-infringing uses, are not staple articles of commerce, and are a material part of MPS's patented synchronous rectifier products.

17.     Meraki committed these acts of infringement without license or authorization, and it has done so with knowledge of the Asserted Patents and egregious disregard for MPS's rights in the Asserted Patents.

18.     Accordingly, MPS requests that Defendants be preliminarily and permanently enjoined from continuing their direct and indirect infringement of MPS's patents, misappropriation of MPS's trade secrets, tortious interference, and unfair competition.  MPS also seeks monetary damages, including trebled damages and attorneys' fees, for Defendants' willful infringement under 35 U.S.C. §§ 284 and 285.

## PARTIES

19.     Plaintiff Monolithic Power Systems, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business and headquarters at 5808 Lake Washington Boulevard NE, Kirkland, Washington 98033.

20.     Plaintiff Chengdu Monolithic Power Systems Co., Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business

at No. 8 Kexin Road, West Park of Export, Processing Zone West Hi-Tech Zone, Chengdu, Sichuan, 611731.

21.     On information and belief, Defendant Meraki Integrated Circuit (Shenzhen) Technology, Ltd. is a corporation organized and existing under the laws of the People's Republic of China with its principal place of business at 7C, 7th Floor, Shenzhen Free Trade Center, 111 Taizi Road, Shekou, Nanshan District, Shenzhen.

22.     On information and belief, Defendant Promate Electronic Co., Ltd. is a corporation organized and existing under the laws of Taiwan with a principal place of business at 4F, No. 32, Section1, Huan Shan Road, Nei Hu District, Taipei 11442, Taiwan.

<u>**JURISDICTION AND VENUE**</u>

23.     This action includes claims for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*., including but not limited to 35 U.S.C. § 271.

24.     This action also includes claims for trade secret misappropriation arising under the Defend Trade Secrets Act under Title 18 of the United States Code, including but not limited to 18 U.S.C. § 1836.

25.     This action also includes state law claims for trade secret misappropriation, tortious interference, and unfair competition.

26.     The Court has subject matter jurisdiction over MPS's claims for patent infringement arising under 35 U.S.C. § 1 *et seq*. and trade secret misappropriation arising under the Defend Trade Secrets Act under 28 U.S.C. §§ 1331 and 1338(a).  The Court has supplemental jurisdiction over MPS's state law claims for trade secret misappropriation, tortious interference, and unfair competition pursuant to 28 U.S.C. § 1367, as these claims form part of the same case or controversy and derives from a common nucleus of operative fact as MPS's claims for patent infringement and trade secret misappropriation arising under the Defend Trade Secrets Act.

27.     This Court has personal jurisdiction over Defendants because, among other things, they have committed, aided, abetted, contributed to, induced, or participated in the commission of patent infringement, trade secret misappropriation, tortious interference, and unfair competition in this judicial district and elsewhere that led to foreseeable harm and injury to MPS in this judicial district.  Defendant Meraki manufactures products that are and have been offered for sale and imported into this forum, including without limitation by Meraki's distributor, Defendant Promate.  Meraki understands, intends, and encourages its products to be offered for sale and imported into this forum by Promate, by referring customers and potential customers in this forum to Promate for acquiring Meraki's products in this forum.  Meraki is also aware of and intends its products to reach this forum through online marketplaces that sell to the United States and this forum, such as Taobao, which, on information and belief, receives Meraki products through Meraki's distributors like Qiansheng.

28.     On information and belief, Defendant Meraki, directly or through its distribution networks, which include Defendant Promate and online market places such as Taobao, regularly places its products within the stream of commerce with the knowledge, understanding, and desire that such products, by themselves or incorporated within their direct or indirect customers' products, including without limitation AC/DC chargers manufactured by other companies, such as Shenzhen ABP Technology Co., Ltd. ("ABP Group"), Shenzhen Lianxunfa Technology Co, Ltd. ("Lianxunfa"), and Bull Group Co., Ltd. ("Bull") or other manufacturers, that use Meraki components, will be shipped to, offered for sale, sold, or used in this forum and throughout the United States.  Thus, Defendants have established minimum contacts within this forum and purposefully availed themselves of the benefits of this forum, and the exercise of personal

jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.

29.     Defendants transact business in this forum because, among other things, they import and offer for sale the Accused Products within this forum.  Defendants are thus subject to personal jurisdiction in this forum.

30.     Defendants are foreign entities that can be sued in any judicial district in the United States. Venue therefore is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c)(3) and/or 1400(b).

## THE ASSERTED PATENTS

31.     MPS incorporates by reference the allegations in the paragraphs above.

32.     Plaintiff Monolithic Power Systems, Inc. owns by assignment all rights to United States Patent No. 8,067,973 ("the '973 Patent"), titled "Driver for a Flyback Converter Using a Transconductance Amplifier and a Comparator," which duly and legally issued on November 29, 2011.  A copy of the '973 Patent is attached as Exhibit A.

33.     Plaintiff Monolithic Power Systems, Inc. owns by assignment all rights to United States Patent No. 8,400,790 ("the '790 Patent"), titled "Latch-Off of Real Time Synchronous Rectification for Light Load Control," which duly and legally issued on March 19, 2013.  A copy of the '790 Patent is attached as Exhibit B.

34.     Plaintiff Chengdu Monolithic Power Systems Co., Ltd. owns by assignment all rights to United States Patent No. 10,432,104 ("the '104 Patent"), titled "Control Circuit for Synchronous Rectifier and The Method Thereof," which duly and legally issued on October 1, 2019.  A copy of the '104 Patent is attached as Exhibit C.

## GENERAL ALLEGATIONS

### MPS Overview

35.     MPS incorporates by reference the allegations in the paragraphs above.

36.     MPS is an industry-leading fabless semiconductor company that designs, develops, markets, and sells semiconductor products, including synchronous rectifier controllers for AC/DC conversion.

37.     MPS has achieved significant growth year over year and great financial success due to its unmatched technical innovation.  MPS has a large patent portfolio covering its semiconductor products including its synchronous rectifier products.  MPS marks the products practicing its patents by, among other things, noting such products are "patent protected" on the datasheets that MPS provides to its customers and potential customers.

38.     MPS's synchronous rectifier products are used and incorporated into a wide range of charging products that require conversion from AC to DC power. MPS's synchronous rectifier technology offers many efficiencies.  For example, MPS's synchronous rectifier technology has fast turn-off speed, which ensures that a certain secondary field-effect transistor ("FET") will never be turned on while the primary FET is turned on. This makes it possible to use MPS's synchronous rectifier technology in two modes: a discontinuous conduction mode ("DCM"), and a continuous conduction mode ("CCM").

39.     In addition, MPS's synchronous rectifier products, like the MP6908, allow for a wide range of potential input voltage. For various technical reasons, this allows MPS's synchronous rectifier products to be integrated into products that use single winding transformers to achieve the best efficiency in the minimum solution size. MPS's products can thus be widely used in various chargers and adapters, including USB power delivery chargers and quick charging applications.

**MPS's Protection of Its Confidential Information**

40.     MPS takes the protection of its confidential information very seriously.  In addition to the confidentiality agreements that MPS requires all of its employees to sign as a condition of their employment, MPS has formulated and implemented strict internal regulations for protecting trade secrets, including but not limited to its IT policy, Design and Development Data Security Procedure, and Employee Handbook.   MPS also strictly controls access to its confidential information through technical means.

41.     The entrances and exits of MPS office buildings are equipped with access control systems.  Only employee with badges or visitor ID cards approved by MPS can enter and visit MPS.  All the visiting and entrance logs are recorded on the system server.

42.     All MPS technical documents and sensitive documents about pricing and customers are subject to restrictions on MPS's network, and accessible only to specific MPS employees working on the corporation's business.  These restrictions are part of MPS's larger security system, which includes reasonable precautions under the circumstances to protect and control access to both its physical facilities and to its electronic data.  Additionally, access to various MPS networks, computer areas, and directories is limited to those areas necessary for an employee to perform his or her duties.  Every MPS computer is password-protected.  MPS employs a variety of other security devices controlled by an Information Technology security team to protect the security and confidentiality of its electronic information, including firewalls, file transfer protocols, and security logs.

43.     As an example, strict authority management and control measures have been adopted for the Design Engineering database file (folder).  This database contains highly confidential information such as design, layout, and circuit diagrams.  Users must obtain the

approval of the vice president of the Design Engineering department in advance, and then the IT/CAD department can set the appropriate access authority.  No user can access the Design Engineering database without approval.

**MPS's Employment of Mr. Dong in February 2016**

44.     Defendants Wei Dong and Lin Sheng are former MPS employees having left MPS's employment in March and April 2017, sequentially.

45.     Mr. Dong applied to work at MPS in November 2015. He was interviewed shortly thereafter and accepted MPS's employment offer to become MPS's Product Line Director for AC/DC products on January 8, 2016.  Despite accepting the offer on January 8, 2016, Mr. Dong oddly requested that MPS postpone a new employee announcement for almost two months, until February 22, for personal reasons.  This was despite the fact that his first day of employment at MPS was February 16, 2016.

46.     On February 15, 2016, Mr. Dong executed MPS's Confidential Information and Invention Assignment Agreement ("Dong NDA") where he agreed, among other obligations, "at all times during [his] employment and thereafter, to hold in strictest confidence, and not to use, reproduce or copy, except for the benefit of [MPS], or to disclose to any person, firm or corporation without written authorization of the Board of Directors of [MPS], any Confidential Information of [MPS]…"  A copy of the Dong NDA is attached as Exhibit D.

47.     The Dong NDA also prohibited him from "keep[ing], access[ing], transmit[ting], stor[ing], transfer[ing], email[ing], or otherwise maintain[ing] any Confidential Information of [MPS]…"  (Exhibit D ¶ 1.1.)

48.     As MPS's Product Line Director for AC/DC products, which requires a strong technical expertise, Mr. Dong (who claims on his resume to have a Ph.D. in electrical engineering)

had access to MPS's confidential information and trade secrets about all of MPS's AC/DC products, including MPS's synchronous rectifier products, like the MP6908, as well as product roadmaps for MPS's future design opportunities.  Such information includes MPS's highly confidential design data, layout data, and plot data for these products, which MPS maintains with the strictest confidentiality, given that disclosure of such information to MPS's competitors would allow them to use MPS's trade secrets to copy MPS's products like the MP6908, causing competitive harm to MPS.  As a Product Line Director, Mr. Dong also had access to MPS's pricing and customer information, so that he could work with the sales team to secure socket wins in customer products, such as battery chargers.

**Mr. Dong Urges MPS to Hire Ms. Sheng Shortly After He Was Hired Without Disclosing Their Prior Relationship**

49.     On information and belief, Mr. Dong and Ms. Sheng have known each other for decades, having attended Tsing Hua University together in the early 1990s.  They worked together at Texas Instruments ("TI") from at least 2007 until 2016, where Mr. Dong was Ms. Sheng's supervisor.  They both started employment at TI's Cary, North Carolina office around the same time in 2006–07, and both worked for TI in China from 2010–2012.

50.     On February 15, 2016, at the same time Mr. Dong was signing his NDA with MPS, Ms. Sheng applied to MPS independently through a recruiter.  MPS's human resources forwarded her resume to the Design Engineering department for consideration, but she was not invited for an interview.  Having not heard back from MPS, Mr. Dong created the position of Staff Architect in the Product Line department for Ms. Sheng to apply to, in order to ensure that she could be hired by MPS and would report to him.  Mr. Dong was very involved in setting up Ms. Sheng's interview schedules and the persons she would be interviewing with.  Neither Mr. Dong nor Ms. Sheng

disclosed to MPS that they had a long work and personal history together going back decades, even though Mr. Dong was personally pushing MPS to hire Ms. Sheng.

**MPS Employment of Ms. Sheng in June 2016**

51.     At Mr. Dong's insistence, ultimately MPS made an employment offer to Ms. Sheng, which she accepted on May 27, 2016.  Once again, Mr. Dong made another odd request that MPS postpone a new employee announcement of Ms. Sheng's hiring until June 6.  Ms. Sheng also asked to delay announcement of her hiring by a couple of months.

52.     Ms. Sheng's first day of employment with MPS was June 6, 2016, and that same day, she executed MPS's Confidential Information and Invention Assignment Agreement ("Sheng NDA") where she agreed to the same relevant contractual provisions as Mr. Dong.  A copy of the Sheng NDA is attached as Exhibit E.  (*See* ¶ 1.1.)

53.     Although a Staff Architect like Ms. Sheng would normally be expected to work out of MPS's engineering headquarters in San Jose, California, Ms. Sheng requested to remain in North Carolina, where she was previously employed, and work remotely for a period of time, after which she would eventually move to California.  However, Ms. Sheng remained a remote employee of MPS during her entire employment with MPS.  On information and belief, Ms. Sheng never intended to move to California and work at MPS's San Jose office, as she knew her tenure as an employee of MPS would be short-lived.

**Mr. Dong and Ms. Sheng Demand Additional Access to MPS Trade Secrets**

54.     A recent forensic analysis of the MPS laptop computers assigned to Mr. Dong and Ms. Sheng for their sole use for MPS business shows that Ms. Sheng's job application with MPS was a premeditated and deliberate effort by Mr. Dong and Ms. Sheng to target MPS for its confidential information.  In 2015, before she joined MPS, Ms. Sheng created a cost competitive

analysis of ideal diode and isolated driver series products of different companies including MPS, and this document continued to be updated throughout 2016 by Ms. Sheng, after she started at MPS.  Cost competitive analysis is not within the job responsibilities of Staff Architects like Ms. Sheng, who are supposed to focus on technical design and engineering issues.  Ms. Sheng created many more competitive analyses, many of which pre-date 2015.

55.     As Staff Architect in the Product Line Department, Ms. Sheng did not have the same level of access to MPS's highly confidential and trade secret information as a typical circuit designer in MPS's Design and Engineering Department.  On or about June 9, 2016, Mr. Dong requested additional access for Ms. Sheng to MPS's highly confidential design database, including design data, layout data, and plot data for certain AC/DC products, including MPS's synchronous rectifier products MP6907 and MP6908, giving Ms. Sheng full technical access as a design engineer, allowing her to access MPS's trade secrets about the products.  Mr. Dong did not provide a reason for requesting this access, even though access to such confidential information is typically unnecessary for Product Line Department employees.  Nonetheless, MPS had no reason at that time to distrust Mr. Dong and Ms. Sheng, so the access was granted.

56.     As part of the request for Ms. Sheng to receive additional access, she mentioned she was working on the MP6908 kickoff and its New Project Objective Report ("NPOR").  Given that Ms. Sheng's cost competitive analysis created in 2015 contains information on the MP69XX series ideal diode and its technical parameters, it appears that Ms. Sheng targeted these products before ever joining MPS.

57.     In August 2016, Ms. Sheng offered to help Mr. Lin Feng, the lead circuit designer at MPS for the MP6908, by attending the design review in Chengdu, China.  This is not a typical job responsibility for Product Line employees and would have given Ms. Sheng access to the

MP6908's highly confidential circuit diagram.  Once again, MPS had no reason at that time to distrust Ms. Sheng, so she was granted the additional access.  Notably, Ms. Sheng asked to see trade secret cross-sectional device structures, electrical design properties, and manufacturing processes in ViewWise (a document-management program that MPS uses to restrict access to confidential files to disallow copying), even though she never designed any circuits during her employment at MPS.  Ms. Sheng is the only non-design employee to whom MPS has ever given this level of access.

**Ms. Sheng Announces Her Abrupt Resignation After Seven Months**

58.     On January 21, 2017, after working at MPS for less than eight months, Ms. Sheng told MPS that she was going to resign for personal reasons.  In addition, she complained that it was difficult for her to do her job remotely, and that she did not have enough access to all design engineering files.  In an effort to accommodate her, and upon her request, Ms. Sheng was transferred from MPS's Product Line Department (where she reported to Mr. Dong) to MPS's Design and Engineering Department (where she would report to MPS's VP of Design Engineering, Mr. Zhengwei Zhang) on February 6, 2017.

59.     Despite being granted the additional access she requested, Ms. Sheng requested a two-month unpaid leave of absence for personal reasons starting on February 6, 2017, during which she maintained her access to MPS design documents.  Ms. Sheng did not give any more information on why she was requesting that leave beyond undescribed "personal reasons."

**Mr. Dong's Abrupt Departure from MPS in March 2017**

60.     On March 6, 2017, after only one year with MPS, Mr. Dong abruptly resigned from MPS.  The explanation he gave was that his family remained on the East Coast of the United States, making it difficult for him to work out of California, and he did not want to work for MPS

remotely.  This explanation is at odds with what he said when he joined MPS one year earlier, as he had previously said he would be moving his family to California.

61.     After Mr. Dong resigned, MPS sent him a letter on March 31, 2017, to remind him of his confidentiality obligations under the NDA with MPS.  A copy of this letter is attached as Exhibit F.

**Ms. Sheng's Ultimate Departure from MPS in April 2017**

62.     On April 6, 2017, the very day her two-month unpaid leave was to end, Ms. Sheng abruptly resigned from MPS.  As explanation given by e-mail on April 3, Ms. Sheng stated she was going "to work on something complete [sic] different at a local IC start-up company."  This was a lie because, on information and belief, she and Mr. Dong had secretly planning to start Meraki in China (not "local" to Ms. Sheng in North Carolina) while still employed at MPS, with the intention that Meraki would compete against MPS for the exact same customers with the exact same products.  On information and belief, Ms. Sheng and Mr. Dong never intended to work for MPS long-term, and resigned in order to steal MPS's trade secret information to start Meraki.

**Forensic Evidence Shows Voluminous Downloads of MPS Trade Secrets Without Authorization or Disclosure to MPS**

63.     In a recent forensic analysis of the MPS laptop computers assigned to Mr. Dong and Ms. Sheng for their sole use for MPS business, Mr. Dong and Ms. Sheng both connected external storage devices to their MPS laptops while employed with MPS and copied MPS's confidential files to those external devices.

64.     Confidential files copied by Mr. Dong include a distribution map of AC/DC products (an internal-only presentation of the different applications and technical specifications of MPS's AC/DC products), a list of strategic customers of these products, and a customer marketing list.

65.     Confidential files copied by Ms. Sheng include multiple competitive analyses, technical design files, and technical evaluations.

66.     As part of the exit interview process, both Mr. Dong and Ms. Sheng signed certifications that they were aware of and would continue to abide by their continuing confidentiality obligations to MPS.  They also falsely certified that they did not have any MPS data storage devices to return, even though the forensic analysis shows that both of them connected external data storage devices to their MPS laptops to copy files.  These certifications are enclosed as Exhibits G and H.

**Formation of Defendant Meraki by Mr. Dong and Ms. Sheng Under False Pretenses in April 2017 Within Two Months of Their Departure From MPS**

67.     On information and belief, Mr. Dong and Ms. Sheng completed the founding of Defendant Meraki on April 20, 2017, less than two months after Mr. Dong resigned from MPS, and only two weeks after Ms. Sheng resigned from MPS.

68.     On information and belief, Mr. Dong and Ms. Sheng registered Meraki under the names of their mothers as principle founders, Ms. Shuzhen Chen (Mr. Dong's mother) and Ms. Rui Wang (Ms. Sheng's mother), to avoid suspicion connected with the registration.  On information and belief, Wei Dong has used other names, including Wayne Dong and Wesley Dong, apparently changing his English name to Wesley only after his employment with MPS ended.  On information and belief, Lin Sheng has used other names, including Elaine Sheng, apparently changing her English name to Elaine only after her employment with MPS ended.

69.     Meraki's business registration also includes as a principal founder an angel investor called Shenzhen Weina Dianshi Space Innovation Co., Ltd. ("Weina").  On information and belief, it would typically take several months or up to a year to negotiate with an angel investor on the formation of a semiconductor company in China, so the fact that Meraki was registered only two

weeks after Ms. Sheng resigned suggests that Mr. Dong and Ms. Sheng had been conducting these negotiations while still employed with MPS.

70.     Meraki is a direct competitor of MPS in the synchronous rectifier market. Meraki's products include synchronous rectifier products including, e.g., the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families. On information and belief, some of Meraki's products are designed to be pin-for-pin compatible with MPS's products like the MP6908, and are even advertised as such.

71.     On information and belief, Meraki's direct and indirect customers include charger manufacturers, such as Lianxunfa, ABP Group, and Bull. On information and belief, manufacturers, such as Lianxunfa, ABP Group, and Bull, manufacture charger products incorporating Meraki's synchronous rectifier products that rely on the claimed inventions of one or more the Asserted Patents as well as numerous MPS's trade secrets.

72.     On information and belief, MPS and Meraki compete for at least some of the same direct or indirect customers including Delta Electronics, Inc. ("Delta"), a major manufacturer of power products, including chargers that utilize synchronous rectifier products. On information and belief, Meraki is unfairly competing with MPS by aggressively pursuing Delta and many other customers (including without limitation Lianxunfa, ABP Group, and Bull) with the intention of displacing MPS by promoting products that are pin-to-pin compatible and undercutting MPS's prices using MPS trade secrets that Mr. Dong and Ms. Sheng unlawfully misappropriated. Indeed, through the misappropriation of MPS's trade secrets, Meraki is unfairly competing against MPS in the synchronous rectifier product market by cutting time to market and decreasing expenditures related to research and development.

**Defendant Meraki Copies MPS Products Using Stolen MPS Trade Secrets**

73.     MPS first learned that Mr. Dong and Ms. Sheng had founded Meraki in February 2019.  Shortly thereafter, MPS learned that Meraki was marketing and selling synchronous rectifier products that they advertised as pin-to-pin compatible with MPS products like the MP6908.

74.     MPS began developing the MP6908 ideal diode as early as 2011, and the MP6908 improved upon prior generations of ideal diode products that were previously developed or under development, such as the MP6900, MP6901, and MP6902.   After years of research and development and multiple design changes, MPS released the first iteration of the MP6908 in October 2017 and made the first shipment to customer Delta in December 2017.  MPS published the MP6908 datasheet on its website in April 2018.

75.     On information and belief, the MK1808 and MP6908 have the same function, features, package, and applications.  The two products even have the same block-level circuits for realization.  Both products are ultra-fast turn-off synchronous rectifiers with the same features, including support for DCM, CCM, quasi-resonant operations and active clamp flyback. Neither product requires auxiliary winding for high-side or low-side rectification, and both products work with standard and logic-level synchronous rectifier MOSFETs.  Both products are available in a SOT23-6 package, and both products are used for USB power delivery and quick charger applications, as well as flyback power supplies with very low and/or variable output voltage.

76.     MK1808 and MP6908 also have the same pin definition, but the MK1808 rearranges the order.  However, on information and belief, Meraki converted the MK1808 to the MK91808 which is pin-to-pin compatible with the MP6908.

77.     As a result, it is apparent that Meraki copied the MK1808 and MK91808 from the MP6908, based on the confidential trade secret materials obtained by Mr. Dong and Ms. Sheng.

Furthermore, on information and belief, Meraki also obtained the customer list and specific customer price information of MP6908, and then began to promote the MK1808 to these target customers with a lower price.

78.    Meraki also developed other synchronous rectifier products, including the MK91718, which is advertised as pin-to-pin compatible with MP9989, which is a co-packaged product of the MP6908 and a MOSFET.

79.    On information and belief, Meraki released the MK1808 in 2018, approximately one year after Meraki was founded, compared to MPS's seven-year development of the MP6908. Given the length of time to define the products, find a proper foundry, acquire electronic design automation ("EDA") software, run circuit simulations, create the layout, complete a tape-out, and conduct road tests, it would not have been possible for Meraki to develop and release its products so quickly had they not misappropriated MPS's trade secrets.

**Meraki Engages in Unfair Competition by Promoting Its Knock-Offs to MPS Customers**

80.    On information and belief, Meraki has approached MPS's customers such as Delta to displace MPS with Meraki's patent-infringing and trade-secret-misappropriation synchronous rectifier products.  Despite Delta being MPS's first and largest customer for the MP6908, on information and belief, Meraki has aggressively pursued displacing MPS by using MPS's trade secret customer and pricing information to undercut MPS's price, and Meraki is now being designed into Delta's solutions.  On information and belief, Meraki has pursued displacing MPS at several of MPS's customers in addition to Delta, including without limitation Lianxunfa, ABP Group, and Bull.

81.    Meraki has also intended and encouraged its patent-infringing and trade-secret-misappropriation synchronous rectifier products to be imported and sold in the United States

through its distribution network including Defendant Promate.  Meraki refers customers and potential customers in the United States to its distribution network including Promate for acquiring Meraki's products in the United States.

**Defendant Meraki's Filing of Patent Applications Incorporating MPS Trade Secrets**

82.     Furthermore, on information and belief, Meraki used and publicly disclosed MPS's confidential trade secrets as part of Meraki's filing for patent applications in China.  Meraki's misappropriation of MPS's trade secrets to file patent applications to Meraki's own benefit, which are then publicized, has competitively harmed MPS by not only publicizing MPS's trade secrets to anyone including MPS's competitors, but also potentially leading to Meraki obtaining Chinese patents with rights to file corresponding applications world-wide including in the United States on technology that was stolen from MPS.

83.     Specifically, Meraki filed two Chinese patent applications CN201810172629.2 and CN201820291252.8 on March 1, 2018, with Mr. Dong and Ms. Sheng named as co-inventors.  The first application was published on July 27, 2018, as CN108336914A and the second application was published and issued on November 16, 2018, as CN208112529U, attached as Exhibits I and J, respectively.  The technical contents disclosed in these two Meraki patent applications are almost the same. They are both directed to secondary controllers for controlling secondary rectifying switches, and how to avoid false turn-on of the synchronous rectifying switch due to voltage ringing in DCM.  When compared to a confidential block diagram of the MP6908, it is apparent that these patent applications have substantially disclosed the same false turn-on solution at the block level as the MP6908, including the reference block, the comparator blocks, an integrator block, and the latch and output block.  These circuit blocks are confidential trade secrets subject to restrictions on MPS's network, although both Mr. Dong and Ms. Sheng had access to this

information during their employment with MPS as part of their work on the MP6908, as described above.

84.    Additionally, Meraki filed a Chinese patent application CN201810181984.6 on March 6, 2018, with Mr. Dong and Ms. Sheng named as co-inventors.  This application has been published as CN108418432A on August 17, 2018, and has been issued as a Chinese Patent No. CN108418432B on December 31, 2019, attached as Exhibit K.  This patent application is directed to control circuits and methods to improve dynamic load response.  This patent application has substantially the same circuit components and layout as the MP6930, an MPS AC/DC product that was developed by MPS but never released to market, meaning all information about that product has been maintained by MPS as confidential trade secrets, although both Mr. Dong and Ms. Sheng had access to this information during their employment with MPS, as described above.  Moreover, Mr. Dong even received an e-mail on March 19, 2016 attaching a confidential power-point presentation about the MP6930 technology.

85.    Additionally, Meraki filed a Chinese patent application CN201920371028.4 on March 22, 2019, with Mr. Dong and Ms. Sheng named as co-inventors.  This application has been published and issued as CN209488469U on October 11, 2019, attached as Exhibit L.  This patent application is directed to secondary controllers for controlling secondary rectifying switches, and specifically how to keep the gate driving signal of the secondary rectifying switch monotonically decreasing before turn-off, to increase efficiency and avoid false turn-off.  This patent application has substantially the same components at the circuit-level as MPS had at one time created and considered as a fast turn-off solution in MPS's MP690X family, including a driving module, a comparing module and a pull-down current module, with a gate driving signal provided to control a secondary rectifying switch.  MPS did not end up adopting this solution for its MP690X family,

so all information about that solution has been maintained by MPS as confidential trade secrets, although both Mr. Dong and Ms. Sheng had access to this information during their employment with MPS as described above.

**Defendants' Familiarity with the Asserted Patents**

86.     On information and belief, Meraki had pre-suit knowledge of MPS's asserted patents based on MPS's employment of Mr. Dong and Ms. Sheng for the design and marketing of MPS's synchronous rectifier products.  During their employment with MPS, Mr. Dong and Ms. Sheng made themselves aware of MPS's patent portfolio covering synchronous rectifier products, including the patents asserted in this complaint.  For example, on November 3, 2016, Mr. Dong e-mailed to Ms. Sheng a list of MPS patents covering MPS's AC/DC products including the '973 and '790 Patents.

87.     Furthermore, the Chinese patent application to which MPS's '104 Patent claims priority was filed on July 11, 2017, shortly after Mr. Dong and Ms. Sheng left MPS, and the named inventors on that patent are all individuals who collaborated with Mr. Dong and Ms. Sheng on the design of synchronous rectifier products, specifically the MP6908.  One of those named inventors is Mr. Lin Feng, the lead circuit designer for the MP6908, and the other three named inventors (Mr. Lei Miao, Mr. Siran Wang, and Mr. Hui Li) all reported to Mr. Dong.  While they were employed with MPS, Mr. Dong and Ms. Sheng specifically discussed filing a patent application covering the technology in the MP6908 with Mr. Feng and Mr. Miao.  No other patent applications listing Mr. Miao as a named inventor were filed by MPS in 2016 or 2017.

88.     Promate has knowledge of MPS's asserted patents from at least the filing and serving of this complaint.

**CLAIMS FOR RELIEF**

**CLAIM 1 – INFRINGEMENT OF U.S. PATENT NO. 8,067,973
BY MERAKI AND PROMATE**

89.     MPS incorporates by reference the allegations in the paragraphs above.

90.     Defendants have directly infringed one or more claims of the '973 Patent under 35 U.S.C. § 271(a) through the manufacture, use, sale, offer for sale, and/or importation into the United States of synchronous rectifier products, including, e.g., the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families, some of which are designed to be pin-for-pin compatible with MPS's products like the MP6908, and are even advertised as such.

91.     For example, Meraki's MK1808 includes all of the limitations of Claim 1 of the '973 Patent.

92.     The MK1808 incorporates a driver circuit for driving a synchronous rectifier FET.

93.     The MK1808 has a transconductance amplifier with one input coupled to a first DC offset, one input coupled to the drain of the synchronous rectifier FET, and the output coupled to the gate of the synchronous rectifier FET (but not through a switch).

94.     The MK1808 has a comparator with one input coupled to a second DC offset, one input coupled to the drain of the synchronous rectifier FET, and the output coupled to the gate of the synchronous rectifier FET through a switch.

95.     In the MK1808, the comparator and transconductance amplifier receive substantially identical signals from the drain of the synchronous rectifier FET.  Thus, the MK1808 includes all limitations of Claim 1 of the '973 Patent.

96.     Defendant Meraki has actively induced the direct infringement of one or more claims of the '973 Patent under 35 U.S.C. § 271(b).  Specifically, Meraki understands, intends, and encourages its products to be used, sold, offered for sale, and/or imported into the United States by its distributors, such as Defendant Promate, by referring customers and potential customers in the United States who contact Meraki's sales representatives to Meraki's distributors like Promate for acquiring Meraki's products in the United States.  Meraki's website provides e-mail, phone, and postal contact information for the specific purpose of obtaining Meraki's products, with the referral to Meraki's distributors like Promate being made once contact is initiated.  Meraki is also aware of and intends its products to reach the United States through online marketplaces that sell to the United States, such as Taobao, which, on information and belief, receives Meraki products through Meraki's distributors like Qiansheng.

97.     Defendants have actively contributed under 35 U.S.C. § 271(c) to the infringement of the '973 Patent by dealers, retailers, distributors, and customers by, for example, selling, offering for sale, importing, and/or using Meraki's synchronous rectifier products in the United States, knowing the same to be especially made or especially adapted for use in the infringement of the '973 Patent when combined in a charger or other AC/DC power product with other circuit components, and not a staple article of commerce suitable for substantial non-infringing use.

98.     Defendants have knowledge of the '973 Patent from at least the filing and serving of this complaint.  On information and belief, Meraki had pre-suit knowledge of the '973 Patent based on MPS's employment of Mr. Dong and Ms. Sheng for the design and marketing of MPS's synchronous rectifier products.  During their employment with MPS, Mr. Dong and Ms. Sheng made themselves aware of MPS's patent portfolio covering synchronous rectifier products,

including the '973 Patent.  For example, on November 3, 2016, Mr. Dong e-mailed to Ms. Sheng

a list of MPS patents covering MPS's AC/DC products including the '973 Patent.

99.     Infringement by Defendant Meraki has been, and continues to be, willful and

deliberate, and has caused substantial damage to MPS.  Meraki, through its founders Mr. Dong

and Ms. Sheng who used to work for MPS, has copied information misappropriated from MPS

including MPS's confidential product specification and description documents for MPS's

synchronous rectifier products, including without limitation the MP6908 product.  As a result,

Meraki has sold the accused devices with the knowledge and intent that they infringe the '973

Patent.

100.     Meraki designed, developed, manufactured, marketed, and sold infringing products

despite knowing there was an objectively high risk that such products infringed the '973 Patent.

Meraki was and is more culpable than a typical infringer because, on information and belief,

Mr. Dong's and Ms. Sheng's and Meraki's knowledge and experience for designing products

comes directly from MPS, including MPS's patented and trade secret technology, rather than

having been developed independently from MPS.  On information and belief, Mr. Dong and

Ms. Sheng used the knowledge and experience they gained during the course of their employment

at MPS to design and develop Meraki's products including, without limitation, synchronous

rectifier products, including, but not limited to, the MK1808, MK91808, MK1718, MK91718,

MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736,

MK91738, MK1705A, MK1706, MK1709, and MK1719 product families.  Meraki's synchronous

rectifier products, including, but not limited to, the MK1808, MK91808, MK1718, MK91718,

MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736,

MK91738, MK1705A, MK1706, MK1709, and MK1719 product families exhibit the same

technology disclosed in both MPS's '973 Patent, as well as MPS's own synchronous rectifier products, including MP6908.  In designing and developing these products, Mr. Dong, Ms. Sheng and Meraki therefore knew that the products were covered by the '973 Patent, or were willfully blind to that risk, but designed, developed, manufactured, marketed, and sold these products despite that objective risk, thus acting in reckless disregard of MPS's patent rights.

101.    As a consequence of Defendants' infringement of the '973 Patent, MPS has suffered and will continue to suffer irreparable harm and injury, for example, in the form of lost sales, lost profits and loss of market share.

102.    Unless enjoined, Defendants and/or others acting on behalf of Defendants will continue their infringing acts, thereby causing additional irreparable injury to MPS for which there is no adequate remedy at law. Specifically, Defendants' actions will irreparably harm MPS's position in the synchronous rectifier market by causing MPS to lose customers including Delta, its first and oldest customer for the MP6908 product, as well as Lianxunfa, ABP Group, and Bull.

## CLAIM 2 – INFRINGEMENT OF U.S. PATENT NO. 8,400,790 BY MERAKI AND PROMATE

103.    MPS incorporates by reference the allegations in the paragraphs above.

104.    Defendants have directly infringed one or more claims of the '790 Patent under 35 U.S.C. § 271(a) through the manufacture, use, sale, offer for sale, and/or importation into the United States of synchronous rectifier products, including, e.g., the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families, some of which are designed to be pin-for-pin compatible with MPS's products like the MP6908, and are even advertised as such.

105. For example, Meraki's MK1808 includes all of the limitations of Claim 1 of the '790 Patent.

106. The MK1808 is a synchronous rectifier with both synchronous rectification circuity and signals.

107. The MK1808 has a light load circuit that receives an input voltage.

108. The MK1808 selectively latches off synchronous rectification based on the input voltage being the same as the gate voltage, as a turn-off blanking time is applied, during which the gate driver signal is latched off. Thus, the MK1808 includes all limitations of Claim 1 of the '790 Patent.

109. Defendant Meraki has actively induced the direct infringement of one or more claims of the '790 Patent under 35 U.S.C. § 271(b). Specifically, Meraki understands, intends, and encourages its products to be used, sold, offered for sale, and/or imported into the United States by its distributors, such as Defendant Promate, by referring customers and potential customers in the United States who contact Meraki's sales representatives to Meraki's distributors like Promate for acquiring Meraki's products in the United States. Meraki's website provides e-mail, phone, and postal contact information for the specific purpose of obtaining Meraki's products, with the referral to Meraki's distributors like Promate being made once contact is initiated. Meraki is also aware of and intends its products to reach the United States through online marketplaces that sell to the United States, such as Taobao, which, on information and belief, receives Meraki products through Meraki's distributors like Qiansheng.

110. Defendants have actively contributed under 35 U.S.C. § 271(c) to the infringement of the '790 Patent by dealers, retailers, distributors, and customers by, for example, selling, offering for sale, importing, and/or using Meraki's synchronous rectifier products in the United

States, knowing the same to be especially made or especially adapted for use in the infringement of the '790 Patent when combined in a charger or other AC/DC power product with other circuit components, and not a staple article of commerce suitable for substantial non-infringing use.

111.   Defendants have knowledge of the '790 Patent from at least the filing and serving of this complaint.  On information and belief, Meraki had pre-suit knowledge of the '790 Patent based on MPS's employment of Mr. Dong and Ms. Sheng for the design and marketing of MPS's synchronous rectifier products.  During their employment with MPS, Mr. Dong and Ms. Sheng made themselves aware of MPS's patent portfolio covering synchronous rectifier products, including the '790 Patent.  For example, on November 3, 2016, Mr. Dong e-mailed to Ms. Sheng a list of MPS patents covering MPS's AC/DC products including the '790 Patent.

112.   Infringement by Defendant Meraki has been, and continues to be, willful and deliberate, and has caused substantial damage to MPS.  Meraki, through its founders Mr. Dong and Ms. Sheng who used to work for MPS, has copied information misappropriated from MPS including MPS's confidential product specification and description documents for MPS's synchronous rectifier products, including without limitation the MP6908 product.  As a result, Meraki has sold the accused devices with the knowledge and intent that they infringe the '790 Patent.

113.   Meraki designed, developed, manufactured, marketed, and sold infringing products despite knowing there was an objectively high risk that such products infringed the '790 Patent. Meraki was and is more culpable than a typical infringer because, on information and belief, Mr. Dong's and Ms. Sheng's and Meraki's knowledge and experience for designing products comes directly from MPS, including MPS's patented and trade secret technology, rather than having been developed independently from MPS.  On information and belief, Mr. Dong and

Ms. Sheng used the knowledge and experience they gained during the course of their employment at MPS to design and develop Meraki's products including, without limitation, synchronous rectifier products, including, but not limited to, the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families.  Meraki's synchronous rectifier products, including, but not limited to, the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families exhibit the same technology disclosed in both MPS's '790 Patent, as well as MPS's own synchronous rectifier products, including MP6908.  In designing and developing these products, Mr. Dong, Ms. Sheng and Meraki therefore knew that the products were covered by the '790 Patent, or were willfully blind to that risk, but designed, developed, manufactured, marketed, and sold these products despite that objective risk, thus acting in reckless disregard of MPS's patent rights.

114.   As a consequence of Defendants' infringement of the '790 Patent, MPS has suffered and will continue to suffer irreparable harm and injury, for example, in the form of lost sales, lost profits and loss of market share.

115.   Unless enjoined, Defendants and/or others acting on behalf of Defendants will continue their infringing acts, thereby causing additional irreparable injury to MPS for which there is no adequate remedy at law. Specifically, Defendants' actions will irreparably harm MPS's position in the synchronous rectifier market by causing MPS to lose customers including Delta, its first and oldest customer for the MP6908 product, as well as Lianxunfa, ABP Group, and Bull.

## CLAIM 3 – INFRINGEMENT OF U.S. PATENT NO. 10,432,104 BY MERAKI AND PROMATE

116.   MPS incorporates by reference the allegations in the paragraphs above.

117.    Defendants have directly infringed one or more claims of the '104 Patent under 35 U.S.C. § 271(a) through the manufacture, use, sale, offer for sale, and/or importation into the United States of synchronous rectifier products, including, e.g., the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families, some of which are designed to be pin-for-pin compatible with MPS's products like the MP6908, and are even advertised as such.

118.    For example, Meraki's MK1808 includes all of the limitations of Claim 3 of the '104 Patent.

119.    The MK1808 is a controller for a synchronous rectifier.

120.    The MK1808 has at least two comparators, the first of which compares a voltage threshold with the voltage across the synchronous rectifier to provide a comparison signal, and the second of which compares a different voltage threshold with the voltage across the synchronous rectifier to provide a comparison signal.

121.    The MK1808 has a pulse circuit receiving the output from the first comparator, and outputting a pulse signal, which pulses for a pre-set time period when the first comparator's output changes.

122.    The MK1808 has a logic gate circuit receiving the pulse signal, as well as the output from the second comparator, which provides an on-control signal based on a logic operation to the pulse signal and output from the second comparator.  This on-control signal controls the "on" operation of the MK1808.  Thus, the MK1808 includes all limitations of Claim 3 of the '104 Patent.

123.    Defendant Meraki has actively induced the direct infringement of one or more claims of the '104 Patent under 35 U.S.C. § 271(b).  Specifically, Meraki understands, intends, and encourages its products to be used, sold, offered for sale, and/or imported into the United States by its distributors, such as Defendant Promate, by referring customers and potential customers in the United States who contact Meraki's sales representatives to Meraki's distributors like Promate for acquiring Meraki's products in the United States.  Meraki's website provides e-mail, phone, and postal contact information for the specific purpose of obtaining Meraki's products, with the referral to Meraki's distributors like Promate being made once contact is initiated.  Meraki is also aware of and intends its products to reach the United States through online marketplaces that sell to the United States, such as Taobao, which, on information and belief, receives Meraki products through Meraki's distributors like Qiansheng.

124.    Defendants have actively contributed under 35 U.S.C. § 271(c) to the infringement of the '104 Patent by dealers, retailers, distributors, and customers by, for example, selling, offering for sale, importing, and/or using Meraki's synchronous rectifier products in the United States, knowing the same to be especially made or especially adapted for use in the infringement of the '104 Patent when combined in a charger or other AC/DC power product with other circuit components, and not a staple article of commerce suitable for substantial non-infringing use.

125.    Defendants have knowledge of the '104 Patent from at least the filing and serving of this complaint.  On information and belief, Meraki had pre-suit knowledge of the '104 Patent based on MPS's employment of Mr. Dong and Ms. Sheng for the design and marketing of MPS's synchronous rectifier products.  During their employment with MPS, Mr. Dong and Ms. Sheng made themselves aware of MPS's patent portfolio covering synchronous rectifier products.  Furthermore, the Chinese patent application to which MPS's '104 Patent claims priority was filed

on July 11, 2017, shortly after Mr. Dong and Ms. Sheng left MPS, and the named inventors on that patent are all individuals who collaborated with Mr. Dong and Ms. Sheng on the design of synchronous rectifier products, specifically the MP6908.  One of those named inventors is Mr. Lin Feng, the lead circuit designer for the MP6908, and the other three named inventors (Mr. Lei Miao, Mr. Siran Wang, and Mr. Hui Li) all reported to Mr. Dong.  While they were employed with MPS, Mr. Dong and Ms. Sheng specifically discussed filing a patent application covering the technology in the MP6908 with Mr. Feng and Mr. Miao.  No other patent applications listing Mr. Miao as a named inventor were filed by MPS in 2016 or 2017.

126.     Infringement by Defendant Meraki has been, and continues to be, willful and deliberate, and has caused substantial damage to MPS.  Meraki, through its founders Mr. Dong and Ms. Sheng who used to work for MPS, has copied information misappropriated from MPS including MPS's confidential product specification and description documents for MPS's synchronous rectifier products, including without limitation the MP6908 product.  As a result, Meraki has sold the accused devices with the knowledge and intent that they infringe the '104 Patent.

127.     Meraki designed, developed, manufactured, marketed, and sold infringing products despite knowing there was an objectively high risk that such products infringed the '104 Patent. Meraki was and is more culpable than a typical infringer because, on information and belief, Mr. Dong's and Ms. Sheng's and Meraki's knowledge and experience for designing products comes directly from MPS, including MPS's patented and trade secret technology, rather than having been developed independently from MPS.  On information and belief, Mr. Dong and Ms. Sheng used the knowledge and experience they gained during the course of their employment at MPS to design and develop Meraki's products including, without limitation, synchronous

rectifier products, including, but not limited to, the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families. Meraki's synchronous rectifier products, including, but not limited to, the MK1808, MK91808, MK1718, MK91718, MK1708, MK1807, MK91807, MK1715, MK1716, MK17350, MK17360, MK91735, MK91736, MK91738, MK1705A, MK1706, MK1709, and MK1719 product families exhibit the same technology disclosed in both MPS's '104 Patent, as well as MPS's own synchronous rectifier products, including MP6908. In designing and developing these products, Mr. Dong, Ms. Sheng and Meraki therefore knew that the products were covered by the '104 Patent, or were willfully blind to that risk, but designed, developed, manufactured, marketed, and sold these products despite that objective risk, thus acting in reckless disregard of MPS's patent rights.

128.    As a consequence of Defendants' infringement of the '104 Patent, MPS has suffered and will continue to suffer irreparable harm and injury, for example, in the form of lost sales, lost profits and loss of market share.

129.    Unless enjoined, Defendants and/or others acting on behalf of Defendants will continue their infringing acts, thereby causing additional irreparable injury to MPS for which there is no adequate remedy at law. Specifically, Defendants' actions will irreparably harm MPS's position in the synchronous rectifier market by causing MPS to lose customers including Delta, its first and oldest customer for the MP6908 product, as well as Lianxunfa, ABP Group, and Bull.

### CLAIM 4 - MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT OF 2016 BY MERAKI

130.    MPS incorporates by reference the allegations in the paragraphs above.

131.    MPS maintains confidential information and trade secrets about MPS's synchronous rectifier products like the MP6908. Such information includes MPS's highly

confidential design data, layout data, and plot data for these products, which MPS's maintains with the strictest confidentiality, given that disclosure of such information to MPS's competitors would allow them to use MPS's trade secrets to copy MPS's products like the MP6908, causing competitive harm to MPS.  It also includes MPS's confidential customer lists and pricing information.

132.    Based on their expertise on the design of MPS's synchronous rectifier products like the MP6908, Mr. Dong and Ms. Sheng also possessed in their minds knowledge of MPS's most critical confidential and proprietary information, including proprietary and confidential know-how, negative know-how (regarding what potential solutions did not work and were unsuccessful), ideas, processes, improvements, discoveries, developments, designs and techniques, and other MPS proprietary and confidential information learned through their tenure at MPS.

133.    MPS's confidential and proprietary information described in the preceding two paragraphs constitute "trade secrets" as defined under 18 U.S.C. § 1839(3). Among other things, this MPS information is confidential and proprietary "financial, business, technical, [and/or] economic" information.

134.    MPS's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors who can obtain economic value from the disclosure or use of the information. MPS derives independent economic value from the confidential design of its products, as MPS's competitive advantage is based on its superior designs.  MPS also derives independent economic value from its customer lists and pricing, as the confidentiality of such information prevents a competitor from undercutting MPS on price.

135.    MPS has taken reasonable steps to maintain the confidentiality of its trade secrets, including, among other measures, requiring all of its employees, as a condition of their employment, to sign MPS's Confidential Information and Invention Assignment Agreement, which prohibits employees from using or disclosing MPS's confidential information outside of MPS, and requires employees to maintain such information in the strictest confidence.

136.    Mr. Dong and Ms. Sheng both signed MPS's Confidential Information and Invention Assignment Agreement and agreed to the provisions therein, after which they were provided access to MPS's trade secret design, customer, and pricing information.

137.    On information and belief, Mr. Dong and Ms. Sheng violated their agreements with MPS by taking MPS's trade secret design information with them when they left MPS, and then proceeding to use that information in Meraki's design of its own synchronous rectifier products, as well as its filing of patent applications in China.

138.    Specifically, Meraki acquired through improper means MPS's trade secrets through at least the breach of contractual duties to return or destroy confidential information obtained during their tenure at MPS.

139.    On information and belief, Meraki also used MPS's trade secret customer and pricing information to undercut MPS's price with MPS's customers like Delta, Lianxunfa, ABP Group, and Bull, in order to displace MPS.

140.    Meraki's continued improper possession of MPS's trade secrets, including highly confidential design, customer, and price data, means that Meraki can continue to harm MPS through further use and disclosure.

141.    As a result, Meraki has violated the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*

142.    As a direct and proximate result of Meraki's violation, MPS has incurred and will continue to incur substantial economic damages through the loss of current and potential customers, lost profits, lost market share, and economic goodwill, in an amount to be proved at trial.

143.    As a direct and proximate cause of Meraki's misappropriation of MPS's confidential and proprietary trade secrets, Meraki has been unjustly enriched and MPS has sustained damages in an amount to be proven at trial. In lieu of damages measured by any other methods, MPS shall be entitled to a reasonable royalty for Meraki's misappropriation of MPS's trade secrets.

144.    Meraki's actions have caused and will continue to cause MPS irreparable harm if not preliminarily and permanently enjoined.

145.    Meraki's actions in converting, misappropriating, and improperly disseminating MPS's trade secrets for Meraki's own gain were willful, wanton, malicious, and were taken with reckless disregard for MPS's rights. Meraki knew or should have known that its retention of MPS's trade secrets was illegal, and that its misappropriation of those trade secrets has been willful and malicious, entitling MPS to an award of exemplary damages under the DTSA.

146.    MPS is also entitled to an award of its reasonable attorney's fees under the DTSA because Meraki willfully and maliciously misappropriated MPS's trade secrets.

147.    MPS has no adequate remedy at law.

148.    MPS therefore seeks a judgment against Meraki for compensatory and exemplary damages, preliminary and permanent injunctive relief, prejudgment interest, an award of costs and reasonable attorneys' fees pursuant to the Defend Trade Secrets Act, equitable relief compelling return to MPS of the converted intellectual property consisting of the patent applications filed in

China listing Dong and Sheng as inventors, including without limitation the applications reflected in Exhibits I, J, K, and L, and such other relief as the Court deems just and proper.

## CLAIM 5 - MISAPPROPRIATION OF TRADE SECRETS UNDER STATE LAW BY MERAKI

149.    MPS incorporates by reference the allegations in the paragraphs above.

150.    Meraki's conduct described above as violating the Defend Trade Secrets Act also violates Texas's codification of the Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. §134A.001 *et seq*. ("TUTSA").

151.    As a direct and proximate result of Meraki's violation, MPS has incurred and will continue to incur substantial economic damages through the loss of current and potential customers and economic goodwill, in an amount to be proved at trial.

152.    As a direct and proximate cause of Meraki's misappropriation of MPS's confidential and proprietary trade secrets, Meraki has been unjustly enriched and MPS has sustained damages in an amount to be proven at trial. In lieu of damages measured by any other methods, MPS shall be entitled to a reasonable royalty for Meraki's misappropriation of MPS's trade secrets.

153.    Meraki's actions in converting, misappropriating, and improperly disseminating MPS's trade secrets for Meraki's own gain were willful, wanton, malicious, and were taken with reckless disregard for MPS's rights. Meraki knew or should have known that its retention of MPS's trade secrets was illegal, and that its misappropriation of those trade secrets has been willful and malicious, entitling MPS to an award of exemplary damages under TUTSA .

154.    Meraki's actions have caused and will continue to cause MPS irreparable harm if not preliminarily and permanently enjoined.

155.    MPS has no adequate remedy at law.

156.   MPS therefore seeks a judgment against Meraki for compensatory and punitive damages, preliminary and permanent injunctive relief, prejudgment interest, an award of costs and reasonable attorneys' fees, equitable relief compelling return to MPS of the converted intellectual property consisting of the patent applications filed in China listing Dong and Sheng as inventors, including without limitation the applications reflected in Exhibits I, J, K, and L, and such other relief as the Court deems just and proper.

## CLAIM 6 - TORTIOUS INTERFERENCE BY MERAKI

157.   MPS incorporates by reference the allegations in the paragraphs above.

158.   MPS has an ongoing marketing and sales relationship with its customers in that MPS develops products for its customers' purchase, often with direct input from those customers. MPS has a reasonable business expectancy that such customers will continue to purchase MPS products.  These business relationships are governed by certain agreements.

159.   MPS has a reasonable business expectancy for a marketing and sales relationship with its potential customers in that there was a reasonable probability that at least some of those potential customers would likely become customers.

160.   MPS's current and potential customers with which it has a business expectancy include Delta, Lianxunfa, ABP Group, and Bull, and others.

161.   Meraki was fully aware of MPS's business expectancy with its current and potential customers, as indicated by Meraki's misappropriation of MPS's confidential customer list through Meraki's founders, Mr. Dong and Ms. Sheng.

162.   On information and belief, Meraki willfully and intentionally interfered with MPS's business expectancy with its current and potential customers, by theft of MPS's highly confidential design data, layout data, and plot data for synchronous rectifier products, which

Meraki used to design, market and sell Meraki's synchronous rectifier products that they advertised as pin-to-pin compatible with MPS products like the MP6908.

163.    On information and belief, Meraki willfully and intentionally interfered with MPS's business expectancy with its current and potential customer, by theft of MPS's highly confidential customer and pricing information to undercut MPS's price, in order for Meraki to displace MPS with its customers, such as Delta.  Despite Delta being MPS's first and largest customer for the MP6908, on information and belief, Meraki has aggressively pursued displacing MPS by using MPS's trade secret customer and pricing information to undercut MPS's price, and Meraki is now being designed into Delta's solutions.  On information and belief, Meraki has pursued displacing MPS at several of MPS's customers in addition to Delta, including without limitation Lianxunfa, ABP Group, and Bull.  On information and belief, Meraki acted with a conscious desire to prevent MPS's ongoing relationship with Delta, Lianxunfa, ABP Group, and Bull, and/or knew that interference with MPS's relationships with Delta, Lianxunfa, ABP Group, and Bull was certain or substantially certain to occur as a result of its conduct.

164.    As a direct and proximate result of Meraki's interference with MPS's customer relationships, MPS has incurred and will continue to incur substantial and actual economic damages through the loss of current and potential customers and economic goodwill, in an amount to be proven at trial.

165.    Meraki's actions in interfering with MPS's customer relationships were willful, wanton, malicious, and were taken with reckless disregard for MPS's rights.

166.    Meraki's actions have caused and will continue to cause MPS irreparable harm if not preliminarily and permanently enjoined.

167.    MPS has no adequate remedy at law.

168.    MPS therefore seeks a judgment against Meraki for compensatory and punitive damages, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and such other relief as the Court deems just and proper.

## CLAIM 7 - UNFAIR COMPETITION BY MERAKI

169.    MPS incorporates by reference the allegations in the paragraphs above.

170.    MPS invested significant and extensive time, labor, skill, and resources to develop the confidential and proprietary information embodied in MPS's synchronous rectifier products.

171.    Meraki's use of the confidential and proprietary information related to MPS's synchronous rectifier products is in direct competition with MPS. Meraki's exploitation of MPS's confidential and proprietary trade secrets provides Meraki with unfair advantage because Meraki has not been burdened with the expense incurred by MPS in designing and developing its competing synchronous rectifier products.

172.    MPS had a reasonable expectancy of entering into valid business relationships with at least some of its potential customers.  MPS reasonably expected that at least some of these potential customers would purchase MPS products.

173.    MPS also had a reasonable expectancy of continuing to sell its products to its current customers.

174.    By advertising its products as "pin-to-pin compatible" with MPS products, Meraki has unfairly competed by passing off its products as containing MPS's technology.

175.    As a direct and proximate result of Meraki's unfair interference with MPS's customer relationships, MPS has incurred and will continue to incur substantial economic and commercial damages through the loss of current and potential customers and economic goodwill, in an amount to be proven at trial.

176.    Meraki's unfair interference with MPS's customer relationships was willful, wanton, malicious, and was taken with reckless disregard for MPS's rights.

177.    Meraki's actions have caused and will continue to cause MPS irreparable harm if not preliminarily and permanently enjoined.

178.    MPS has no adequate remedy at law.

179.    MPS therefore seeks a judgment against Meraki for compensatory and punitive damages, preliminary and permanent injunctive relief, prejudgment interest, an award of costs, and such other relief as the Court deems just and proper.

## SPOLIATION OF EVIDENCE

180.    MPS incorporates by reference the allegations in the paragraphs above.

181.    Meraki has a duty to preserve relevant evidence, including relevant electronically stored information (ESI).

182.    MPS gives notice that it will seek all available remedies for spoliation of evidence that may be revealed through discovery, including an adverse inference instruction to the jury if appropriate.

## DEMAND FOR JURY TRIAL

183.    MPS hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

Wherefore, MPS prays for relief as follows:

A.      That the Court render judgment declaring that Defendants Meraki and Promate have infringed, directly and/or indirectly, literally or under the doctrine of equivalents, the '973 Patent, '790 Patent, and '104 Patent in violation of 35 U.S.C. § 271;

B.      That the Court render judgment declaring Defendants Meraki's infringement of the '973 Patent, '790 Patent, and '104 Patent is willful and deliberate;

C.      That MPS be awarded damages adequate to compensate MPS for Defendants Meraki's and Promate's infringement of the '973 Patent, '790 Patent, and '104 Patent;

D.      That the Court temporarily, preliminarily, and permanently enjoin Defendants Meraki and Promate; their successors, assigns, subsidiaries, and transferees; their officers, directors, agents, and employees; and all others working on Defendants Meraki's or Promate's behalf from making, using, selling, offering for sale, or importing in the United States any product falling within the scope of the '973 Patent, '790 Patent, and '104 Patent, or inducing or contributing to the infringement of others;

E.      That the Court render judgment declaring this to be an exceptional case and awarding treble damages to MPS for the unlawful practices of Defendants;

F.      That MPS be awarded damages adequate to compensate MPS for Meraki's misappropriation of trade secrets, tortious interference, and unfair competition;

G.      That the Court temporarily, preliminarily, and permanently enjoin Meraki; their successors, assigns, subsidiaries, and transferees; their officers, directors, agents, and employees; and all others working on Meraki's behalf from engaging in further misappropriation of trade secrets, tortious interference, and unfair competition;

H.     That MPS be awarded equitable relief compelling return to MPS of the converted intellectual property consisting of the patent applications filed in China listing Mr. Dong and Ms. Sheng as inventors, including without limitation the applications reflected in Exhibits I, J, K, and L, as well as all corresponding applications world-wide including in the United States;

I.     That the Court render an equitable accounting and disgorgement of any unjust enrichment;

J.     That MPS be awarded exemplary and punitive damages for Meraki's willful, wanton, and malicious conduct;

K.     That MPS be awarded its costs, expenses, and reasonable attorneys' fees;

L.     That the Court order a full accounting of the damages above, including for past infringement and any continuing or future infringement;

M.     That MPS be awarded pre-judgment and post-judgment interest on all damages awarded; and

N.     Such other and further relief as the Court deems just and proper.


Dated:  September 25, 2020                Respectfully submitted,

                                         **PERKINS COIE LLP**


                                         By: _/s/ Janice L. Ta_____

                                         Janice L. Ta (Texas State Bar No. 24075138)
                                         JTa@perkinscoie.com
                                         500 W 2nd Street, Suite 1900
                                         Austin, TX  78701
                                         Telephone: (737) 256-6125
                                         Facsimile: (737) 256-6300

                                         **ATTORNEYS FOR PLAINTIFFS**